THE STATE ex rel. EXCHANGE BANK v. ALLISON, Appellant.

In Banc, March 27, 1900.

1. **Pleading**: MANDAMUS. The denial in the return to an alternative writ of *mandamus* must be direct and specific, and matter in avoidance must be pleaded with certainty.

2. **Statutes**: CONSTRUCTION: LEGISLATIVE INTENT. Where the legislature issues a codification or revision of laws, and, as a part of it, lays down definitions and rules of construction of terms therein expressed, the courts ascertain the meaning of the lawmakers by applying those definitions to such terms and by following those rules of construction.

3. **County Warrants: REVENUE: TREASURER.** The revenue for current expenses provided by statute for any one fiscal year must be first applied to the payment of the ordinary and usual expenses incurred in conducting the necessary business of the county for the year. *Held*, in the case adjudged, that the county treasurer properly refused to pay relator's warrant issued after May 1st, 1895, for county expenses for that year incurred after that date, in preference to warrants issued between January 1st and May 1st of the same year for the same purpose.

4. **County Revenue: FISCAL YEAR.** The county fiscal year begins on the first day of January and ends on the thirty-first day of December. (GANTT, C. J., and BURGESS, J., dissenting.)

Appeal from Ray Circuit Court.—*Hon. E. J. Broaddus, Judge.*

REVERSED.

*J. W. Shotwell & Son* for appellant.

(1) The filing of the demurrer admits all facts, set up in the return to the writ, that are well pleaded, and upon the facts so admitted in this case the judgment and finding of the trial court must be reversed. (2) By section 8589, R. S. 1889, and by the decisions of this court, the fiscal year begins the first day of January and closes the thirty-first day of December of each year. State ex rel. v. Appleby, 136 Mo. 408; Wilson v. Knox Co., 132 Mo. 387. The return to the alternative writ denies all allegations in the petition and writ not specifically admitted, and therefore denies that relator is the legal owner of the warrants and scrip set up in the petition, and writ. The relator sues by the name of "Exchange Bank of Richmond," and all of said warrants and scrip are assigned, as shown by the petition and writ, to "Exchange Bank," not to the "Exchange Bank of Richmond."

*Lavelock, Kirkpatrick & Divelbiss* for respondent.

(1) The return of the appellant to the alternative writ of mandamus is not sufficiently specific to raise an issue, and

the demurrer thereto was properly sustained. Merrill on Mandamus, sec. 274; High on Extr. Leg. Rem. (2 Ed.), secs. 460-464; 7 Lawson's R. R. & Pr., secs. 4037; State ex rel. v. Williams, 96 Mo. 18; State ex rel. v. Trammel, 106 Mo. 515; State ex rel. v. Beyers, 41 Mo. App. 507; Sansom v. Mercer, 68 Tex. 488; Woodruff v. Railroad, 59 Conn. 93; Williams v. New Haven, 68 Conn. 263. (2) The income and revenue provided to meet the necessary expenses of maintaining the county government for any one fiscal year must be applied to the payment of the indebtedness of that year, and warrant issued for the necessary expenses of such year, and drawn on and payable out of the revenue fund so provided, levied and collected for that fiscal year, are entitled to priority over outstanding warrants of prior years. Const. of Mo., art. 10, sec. 12; R. S. 1889, secs. 3166, 3167; Laws 1893, p. 131; High on Ex. Leg. Rem. (2 Ed.), sec. 352; State ex rel. v. Macon Co. Ct., 68 Mo. 46; Lamar Water Co. v. City of Lamar, 128 Mo. 188; Andrew County ex rel. v. Schell, 135 Mo. 31; Shaw v. Statler, 15 Pac. Rep. 833; Schwartz v. Wilson, 15 Pac. Rep. 449; San F. Gas Co. v. Brickwedel, 62 Cal. 641; Smith v. Broderick, 107 Cal. 644; McBean v. Fresno, 112 Cal. 159. (3) The word "year" ordinarily means a "calendar year," but when reference is made to matters of revenue, it relates to a "fiscal year," and means the period of time embraced between the opening and closing of the annual account. While this period, "as to the State," commences on the first day of January of each year, as to the county it commences on the first day of May. R. S., secs. 3187, 3188, 3166; Andrew County ex rel. v. Schell, 135 Mo. 31.

VALLIANT, J.—This is an appeal from a judgment of the circuit court of Ray county awarding a peremptory writ of mandamus against the defendant, the appellant, the treasurer of the county requiring him to pay certain county warrants held by the relator. The case was submitted for final judgment on

demurrer to the return to the alternative writ. Therefore the facts presented in the record are undisputed. The facts are that the relator, the Exchange Bank of Richmond, held certain warrants amounting to $302.95, regularly issued under order of the county court during the year 1895, for current expenses of the county during that year, and drawn against the county revenue fund for that year, duly registered, presented and protested for non-payment. These warrants of the relator were issued after May 1, 1895, for county expenses incurred after that date.

At the time they were presented and payment refused the county treasurer had on hand belonging to the county revenue fund for that year $1,700, but the reason he refused to pay them was that there were outstanding unpaid registered warrants issued prior to May 1, 1895, amounting to $32,000, of which $22,000 were issued prior to January 1, 1895, for county expenses incurred before that date, and $10,000 were issued between January 1, and May 1, 1895, for necessary current expenses of the county incurred during that period, and which warrants were registered, presented for payment and protested before the issuance of relator's warrants, and the money on hand was held to be applied towards the payment of those senior warrants.

In the brief for respondent there is some criticism of the form of the return, the argument being that it does not with sufficient certainty state facts to justify the refusal to pay the relator's warrants. The rule of pleading in such case is correctly stated by the learned counsel. A mere general denial is not a sufficient traverse of the material recitals in the writ. The denial must be direct and specific, and matter in avoidance must also conform to the rules of pleading in respect of certainty. [State ex rel. v. Williams, 96 Mo. 13; State ex rel. v. Trammel, 106 Mo. 510.]

But the point in this return is not its denials, but its averment that there were outstanding warrants drawn on the

county revenue fund to the amount of $10,000 issued to pay for necessary current county expenses incurred between January 1 and May 1 of that year, and which were registered, presented and protested before those of the relator were issued. If under the law those outstanding senior warrants were entitled to be paid before those of relator of more recent date the fact is sufficiently pleaded in the return.

And the respondent is correct in the second proposition advanced in its brief, viz.: the revenue provided for any one fiscal year must be first applied to the payment of the ordinary and usual expenses incurred in conducting the necessary business of the county for that year. It was so expressly decided by this court in Andrew Co. ex rel. v. Schell, 135 Mo. 31. Therefore as to $22,000 of the $32,000 of outstanding county warrants, they afforded no reason for the non-payment of the relator's warrants and with reference to the remaining $10,000 of those warrants they also were no answer to the relator's demand, if the relator is right in his contention that the fiscal year for the county began May 1, 1895, but if the fiscal year for the county began January 1, 1895, then the relator's warrants must wait on the payment of those issued, presented and registered before May 1 of that year. The sole question then is when does the fiscal year for the county begin? That question has already since the judgment of the circuit court in this case, been answered by this court in two decisions. Wilson v. Knox County, 132 Mo. 387, and State ex rel. v. Appleby, 136 Mo. 408. But respondent asks us to review the subject again, and we will not refuse to do so in the light of the earnest argument in that behalf.

The judiciary in its own sphere is independent of both the other departments of government, and therefore in the interpretation of instruments passing under its judgment it acts independently of suggestion or direction of the legislature unless the instrument under consideration for construction is the utterance of the legislature itself, made contemporaneously

State ex rel. v. Allison.

with or in conformity to such suggestion or direction, or unless it is an act done in view of the legislative definition. But when the legislature issues a codification or revision of laws and as a part of it lays down definitions and rules of construction of terms therein used, the courts get at the meaning of the lawmakers by applying those definitions to those terms, and following those rules of construction. The definition under those circumstances is authoritative, and to be read into the statute as a part of itself. Therefore when the legislature declares as it has in section 3166, Revised Statutes 1889, as interpreted by this court in Andrew Co. ex rel. v. Schell, *supra*, that no warrant shall be paid out of the county's revenue "for any one year" until the necessary expenses incurred in maintaining the county for that year are paid, and when in the same revision it further declares (sec. 6570): "......First, words and phrases shall be taken in their plain or ordinary and usual sense; .......third, the word 'month' shall mean a calendar month, and the word 'year' shall mean a calendar year, unless otherwise expressed, and the word 'year' shall be equivalent to the words 'year of our Lord,'" it would seem to leave no room for construction as to the meaning of the words "for any one year" in the section first quoted. That an artificial year for a particular purpose may be designated either in a matter of private contract or a public act, is unquestioned, and it is not unusual that such is the case in statutes relating to the public revenue. Under the General Statutes of 1865, the fiscal year began October 1, and ended September 30th of each year (G. S. 1865, chap. 10, section 11), and so the law was until the act of November 13, 1868 (Laws 1868, p. 178), when that statute was amended defining the fiscal year as beginning January 1st, and ending December 31st, and so it has remained ever since. [Revised Statutes 1889, sec. 8589.] It is contended, however, that the statute applies to State affairs only, and not to those of a county, it being in the chapter treating particularly of the

State Treasury department. The language is: "The fiscal
year of the State shall commence on January first and ter-
minate on the thirty-first day of December in each year, and
the books, accounts and reports of the public officers shall be
made to conform thereto; and all reports required by law to
be made to the General Assembly shall be made during the
first twenty days after the meeting of the General Assem-
bly."

This is the same as the law was in 1865 except that Jan-
uary and December are now substituted for October and
September, and the reports to the General Assembly are now
required to be made within the first twenty days instead of
the first week of its session. The argument for the relator
is that the term "public officer" therein used to designate those
required to conform their books, etc., to those dates are State
officers alone. This argument, drawn as it is from the lan-
guage and immediate context of the statute, it being a section
in the chapter creating the State Treasury department, is not
without force, but taking the section in connection with the
whole subject of revenue as treated in the chapter, we think
the construction the relator put upon it is too restricted.
The revenue for the State and that for the county is collected
by the same officer and at the same time. While the legisla-
ture was dealing with the subject of the fiscal year, if it in-
tended to give it one limit for the State and another for the
county, it would very naturally have given expression to that
intention at that time. The language is not that the fiscal
year for the State revenue shall commence on the first day of
January, etc., but is, "the fiscal year of the State shall com-
mence," etc. The natural meaning of the words would in-
clude a county as a part of the State, and it would doubtless
have never occurred to any one to put a different construction
on it if it were not for the uncertainty as to providing for the
county's current expenses for the first four months of the year
before the county court meets to assess the tax.

That the legislature intended that the fiscal year of the

State should be the fiscal year of the county also, is shown in the changes made in other sections to conform to the change made in that section when it changed the year running from October 1st, to September 30th, and made it from January 1st to December 31st. The county collector then, as now, settled his accounts with the county court, but under the law of 1865 his final settlement for the year was made on the third Monday in December, and thirty days thereafter, he made his final settlement with the auditor. [G. S. 1865, ch. 13, secs. 46, 52.] Now his final settlement is made on the first Monday in March and his settlement with the auditor thirty days thereafter. [Secs. 7627 and 7637, R. S. 1889.]

The language of section 11, chapter 10, General Statutes 1865, above quoted, is: "The fiscal year of the State shall commence," etc. . . . . . . ."and the books, accounts and reports of the public officers shall be made to conform thereto," etc. Then closely following in the same chapter, and treating the same subject is section 16: "All collectors of the revenue, and others bound, by law, to pay money directly into the State Treasury, shall exhibit their accounts to the auditor on or before the first Monday in January in each year to be audited," etc.

The officers referred to in that section were the "public officers" referred to in section 11, and that that term included county officers is manifest by reading as we are bound to do the two sections together, and further by the fact that when section 11 was amended as it now appears, as section 8589, Revised Statutes 1889, the section 16 was also amended as it now appears in section 8595, Revised Statutes 1889, so as to read as follows: "All officers and others bound by law to pay money directly into the State Treasury shall exhibit their accounts and vouchers to the State Auditor on or before the thirty-first day of December, to be audited, adjusted and settled, except the collectors of revenue, who shall, immediately after their settlement with the county court on the first

Monday in March in each year, exhibit their accounts," etc. So although these two sections are in the chapter entitled "Treasury, State," yet they treat of the county collector and his settlement with the county court.

The county assessor is required to complete his assessment, and return his book to the county court on or before February 20th. [Sec. 7571.] Those persons who conceive themselves aggrieved may appeal from the assessment so returned, to the county board of equalization (sec. 7572), which board is to meet on the first Monday in April (sec. 7515) to equalize and correct the assessments and adjust the assessor's books, which are then returned to the county court, and that court is required as soon thereafter as may be to "ascertain the sum necessary to be raised for county purposes, and fix the rate of taxes on the several subjects of taxation" (sec. 7660), the limit of which is prescribed, as the Constitution requires, in section 7662. Then it is made the duty of the county court at its May term to appropriate, apportion and subdivide the revenue for the various purposes as prescribed in section 7663.

It thus appears that it is not until the May term that the county court knows exactly what the aggregate assessment of the county is, and it is not until then that the rate of taxation is fixed and the exact amount of revenue to be levied is ascertained. And in view of that condition and of the constitutional provision that forbids a county to incur debts in any one year to exceed its income and revenue provided for that year (sec. 12, art. 10, Constitution), the relator contends that it conclusively follows that the fiscal year for the county begins on May 1st. The argument is not without persuasive force to show that it would be a convenient provision if the legislature should see fit to so enact, but it does not demonstrate that the statutes in their present form must receive that construction or fail of their purpose. And we must be forced to that result before we would be justified in giving to the word

"year" an artificial meaning in the face of the rule of construction and definition laid down in the contemporaneous statute above quoted. But really whilst there is some uncertainty it is not very serious. True, from January to May, one-third of the year, the county court can not know the exact amount of revenue that the taxpayers will be called on to furnish. This uncertainty exists because the exact valuation of the taxable property in the county is then unknown, and the rate of taxation has not then been fixed, yet expenses are necessarily incurred in carrying on the county government and maintaining its duty to the State. But is certainty to that degree necessary? Can not the revenue for the ensuing year be estimated on the first of January with sufficient approximation for the purpose of putting reasonably safe limits to the debts to be incurred? Even after May 1st, there must be an element of uncertainty in the amount of the county's income because all may not be collected that is assessed. Ordinarily there is not such a difference between the aggregate assessment of the county for one year, and the following, as would put the county judges to sea, and if any unusual event had taken place since the last assessment likely to produce an extraordinary diminution or increase in the value of the county's property, the county judges would be apt to know it. The economic problem for them to solve is the amount of indebtedness it will be prudent to incur for the county for four months in view of the probable income. As a common sense business problem there is nothing very difficult about it, and if county judges are not to be accredited with sufficient discretion to determine a matter of that kind, then our whole system is wrong. The county court can keep safely within the constitutional limitation, and follow strictly the provisions of the statutes above quoted, and still count the fiscal year as beginning on January first, and ending December thirty-first. We have followed the learned counsel for the relator in his

brief but we see no reason to question the soundness of the decision in Wilson v. Knox County, *supra*, or in State ex rel. v. Appleby, *supra*, to the same effect.    Upon a review of the whole subject, we again conclude that the fiscal year for the county as well as the State, begins January first, and ends December thirty-first.

The judgment of the circuit court is reversed. *Sherwood, Brace* and *Marshall, JJ.*, concur; *Gantt, C. J.*, and *Burgess, J.*, dissent; *Robinson, J.*, absent.

GANTT, C. J. (dissenting).—I. This appeal is properly in this court, as its determination necessarily "involves the construction of the revenue laws of this State."    Const., art. 6, secs. 12 and 27, and amendment of 1884, secs. 4 and 5.

II.    This court in State ex rel. v. Williams, 96 Mo. loc. cit. 18, in determining the sufficiency of a return to an alternative writ of mandamus, said:    "It is, therefore, clear that the return must conform to the common law rules; and this is none the less so because the relator may plead to or traverse all or any part of the facts stated in the return."    [State ex rel. v. Trammel, 106 Mo. loc. cit. 515; State ex rel. v. Beyers, 41 Mo. App. loc. cit. 507.]    Now, at the common law, a mere general denial was a nullity. "When any new matters are relied upon as a defense to the writ, the return must positively, clearly, specifically and distinctly set out the facts relative thereto, so that the relator may be able to traverse them, and the court may be able to see at once whether, if established, they justify a disobedience of the writ."    [Merrill on Mandamus, sec. 274; High on Extraordinary Legal Remedies, sec. 460; 7 Lawson on Rights, Remedies and Practices, sec. 4037; People ex rel. v. Salomon, 46 Ill. 333; Com. ex rel. v. Commissioners of Alleghany, 37 Pa. St. 277; Bank of Albany v. Commrs., 10 Wend. 25; Woodruff v. Railroad, 59 Conn. 63; Ray v. Wilson, 29 Fla. 342.]

The alternative writ having stated a *prima facie* case

showing that relator's warrants had been issued in payment of the necessary running expenses of the county during and for the year 1895, relator was entitled to have them paid out of the revenue provided for that year, unless other warrants for the same purpose for the year had been previously issued and registered.

How does the treasurer excuse his refusal to pay them? After admitting that he was the treasurer and that the assessed valuation for that year was as alleged in the alternative writ and the levy, appropriation and apportionment of the revenue for 1895 as averred in the writ, he admits that on December 20, 1895, when the demand was made upon him by relator, he had on hand the sum of seventeen hundred dollars belonging to the "County Revenue Fund" of that year, on which relator's warrants were drawn, but as a reason for not honoring said warrants says: "At the date of the issuance and service of the alternative writ, there were outstanding and unpaid warrants issued prior to the May term, 1895, of the Ray county court and registered prior thereto for alleged indebtedness incurred in the ordinary expenses and services for the necessary maintenance of the said county in the sum of $32,-000 of the same class as relator's warrants and drawn on the said revenue fund. That about $10,000 of said indebtedness shown by warrants was incurred and warrants protested between January 1st, 1895, and the first Monday in May, 1895, the remainder being for calendar years prior to 1895, and within five years and duly protested prior to those of relator and remained unpaid for want of funds."

Judge BURGESS, and I dissent from the views of our brethren on the remaining question in the case. This court in Banc and in each division has construed section 3166, Revised Statutes 1889, and held that the revenue provided for any one fiscal year must be first applied to the payment of warrants drawn from the expenses of the year for which the taxes were levied. [Andrew County ex rel. v. Schell, 135

Mo. 31; State ex rel. Egger v. Payne, 151 Mo. 663; Railroad Co. v. Thornton, 152 Mo. 570.]

The statute in our opinion, is not susceptible of any other construction. The act itself negatives any other view. It provides: "No warrants issued on account of any debt incurred by any county other than those issued on account of the ordinary and usual expenses of the county, shall be paid until all warrants issued for money due from the county on account of services that are usual, and for all expenses necessary to maintain the county organization for any one year shall have been fully paid and liquidated."

Following this construction of the statute in question, it is plain that so much of the return as avers the issuance and registering of warrants for indebtedness incurred for years previous to 1895 to the amount of twenty-two thousand dollars constitutes no legal reason for failure to pay relator's warrants.

But it is more difficult to determine the sufficiency of the allegation as to ten thousand dollars of said indebtedness. It will be observed that it is averred that all of said thirty-two thousand dollars was incurred "for the ordinary expenses and services for the necessary maintenance of the said county" and that "about ten thousand dollars of said indebtedness shown by warrants was incurred and warrants protested between January 1, 1895, and the first Monday in May, 1895." Now, if the fiscal year, 1895, began on January 1st and ended December 31st of that year, we think these allegations of the return taken together, quite distinctly show that there were outstanding warrants of said county issued for the necessary maintenance of the said county organization to the amount of ten thousand dollars, which were prior to relator's and duly registered and protested, and if so were entitled to be paid before relator's out of the fund on hand. If on the other hand, the fiscal year under our laws begins on the first Mon-

day in May and ends on the first Monday in May of the next year, then the warrants issued prior to May, 1895, were not incurred in the fiscal year 1895, and afford no excuse for refusing to pay relator's warrants incurred and issued after May, 1895, and prior to May, 1896.

What is the state of the law on this question? Subsequent to the judgment in the circuit court this identical question has been before this court in two cases. [Wilson v. Knox County, 132 Mo. 387, and State ex rel. Vaughan v. Appleby et al., 136 Mo. 408.] In each it was ruled that the fiscal year of county affairs begins the first day of January and ends on the thirty-first day of December of each year. The first case was decided by the court in Banc, and the second by Division No. One of this court. Both were unanimous opinions.

Learned counsel for relator, in a most respectful but earnest manner, challenge the correctness of those opinions and ask a review thereof. The question being one which affects every county court and county treasurer in the State and every creditor of said counties, is in our opinion entitled to a most careful consideration.

In State ex rel. v. Appleby, 136 Mo. 408, the court, without discussion, simply followed Wilson v. Knox County. So that the construction of the statute so far as this court has spoken, rests upon the reasoning employed in the latter case. Speaking for the court then, Chief Justice BRACE said: "Respondent contends that the fiscal year does begin on the first of March in each year. It is possible that there may be some good reasons why the fiscal year should begin on the first of March in each year, and respondent thinks there are, in the fact that the county is required at its May term to apportion the revenue to the several funds provided for, and the collector is required to return his delinquent list and make final settlement with the county court on the first Monday in March of each year. However cogent these reasons may be, we are

relieved of the necessity of considering them by the fact that it is otherwise provided by statute and has been for more than twenty-five years (R. S. 1889, sec. 8589; R. S. 1879, sec. 7563; Laws 1868, p. 178, sec. 1, by which it is provided that 'the fiscal year of the State shall commence on January first, and terminate on the thirty-first day of December in each year, and the books, accounts and reports of the public officers shall be made to conform thereto')......In contemplation of the law the revenues of the State for the year past are to be in the hands of its officers, on or before the first day of January of the next year.   [R. S. 1889, sec. 7605.]"   The learned judge then noted that the collectors of revenue in the several counties are allowed till the first Monday in March (R. S. 1889, sec. 8595), to collect the revenues and make their final settlements and says that is an express exception to the section 8589.

In the foregoing we have substantially all that is said on the subject.

Relator contends, first, that section 8589, Revised Statutes 1889, by its terms is limited to the treasury department of the State.   By reference to this section 8589, it will be seen that it is found in chapter 164, article 1, entitled "State Treasury—Treasury Department," and not one provision in the entire chapter refers to county treasuries.   The section preceding it, 8588, prescribes the duty of the State Auditor. He is made the general accountant of the State, and the keeper of all public account books, accounts, vouchers, documents, bonds and coupons, paid or redeemed and all papers relating to the accounts and contracts of the State and its revenue, debt and fiscal affairs.   Section 8589 then follows, and enacts that the "fiscal year of the State shall commence on January first and terminate on the thirty-first day of December in each year, and the books, accounts and reports of the public officers shall be made to conform thereto; and all reports required by law to be made to the General Assembly shall be

made durnig the first twenty days after the meeting of the General Assembly?" Now what public officers are referred to here? We think unquestionably State officers, such as the State Auditor, State Treasurer, Insurance Commissioner and Secretary of State, etc. The county officers are not required to make reports of county revenue to the State Auditor under this section. The whole context, we think, clearly, excludes the county officers.

The obvious and clearly expressed purpose, was to enable the State Auditor to make his report of the condition of the revenue and expenditures of the State for the two preceding years. The collector is not required to report county revenue to the State Auditor but to the county court. [Section 3176.] The county court by section 3187, is required to make a statement of county revenue and expenditures for the preceding year at the May or spring term of said court in each year, and their statement is required to be recorded and published. The two statutes are harmonious because they have reference to entirely different functionaries.

But it is said in the majority opinion: "This argument is not without force but taking the section in connection with the whole subject of revenue as treated in the chapter we think the construction put upon it is too restricted. The revenue for the State and that for the county is collected by the same officer and at the same time."

But what revenue is treated of in this chapter? There is not the remotest reference to county revenue to be found in the entire chapter. Section 8595 is appealed to in support of the view taken by our brethren but that section is expressly limited to the accounts of "officers and others bound by law to pay money directly into the State Treasury," among whom of course are the county collectors, but they only are required to pay the State revenue in the State Treasury. [Section 7637, R. S. 1889.]

The reference to the county collectors and the county

court in no manner militates against our contention that the
subject-matter of this chapter 164, and the only subject-matter
treated in it, is state revenue for which the county collector
must account to the State Auditor, as it is only for the pur-
pose of fixing the time when he must make his final settlement
of state revenue with the Auditor.

Section 8595, Revised Statutes 1889, is "All officers and
others bound by law to pay money directly into the State
Treasury shall exhibit their accounts and vouchers to the
State Auditor on or before the thirty-first day of December,
to be audited, adjusted and settled, except the collectors of
the revenue, who shall, immediately after their settlement
with the county court on the first Monday in March in each
year, exhibit their accounts and vouchers to the State Auditor
to be audited, adjusted and settled; and the State Auditor shall
proceed, without unnecessary delay, to audit, adjust and
settle the same, and report to the Treasurer the balance found
due."

So that we most respectfully but firmly insist that the
argument made by our brethren on the assumption that "the
whole subject of revenue" is treated in the chapter, and that
this chapter treats of the duty "of the county collector and his
settlements with the county court," are not sustained by the
text of the chapter itself. On the contrary the law govern-
ing county collectors and county courts regarding their settle-
ments is to be found in article 3, chapter 138, Revised Stat-
utes 1889, and negatives the assumption that the fiscal year of
the State includes the county's fiscal affairs. The two rev-
enues are distinguished throughout our laws.

Again, it is said that the fact that the collector is given
until March to make his final settlement of the State revenue
with the State Auditor is an exception and the only exception
to the ending of the fiscal year of both the State and county.

In our view of the law the time when the collector makes
his final settlement does not affect the question involved in

this record. The getting of the revenue into the treasury is a distinct thing from the providing by levy for the expenses of the county, and requiring the warrants drawn against that revenue to be limited to the amount provided for each year, and this necessarily raises the question what is the beginning and ending of the year within the meaning of the Constitution and our statute on this subject.

We do not controvert that "a calendar year" is meant in all statutes of this State unless otherwise expressed, but we think that when the Constitution and the statutes *in pari materia* are considered it is "otherwise expressed."

We think that the detailed statement required by section 8590 of the State Auditor, relates solely to State expenditures and not to county revenue and expenditures.

Applying the familiar principle of "*noscitur a sociis,*" we are satisfied that section 8589 refers exclusively to State revenues and expenditures, and excludes the idea that the Legislature had any reference to the fiscal year of the county administration and revenues. Not only the wording but the entire scope of the statute restricts said section 8589 to the State and excludes the county. We must then look elsewhere than this section, to find the beginning and ending of the fiscal year of the county revenues within the meaning of the Constitution of Missouri, article 10, section 12, which provides that "no county.......shall be allowed to become indebted in any manner or for any purpose to any amount exceeding in any year the income and revenue provided for such year."

The tax authorized by section 11, article 10, of the Constitution, is an annual tax and the counties of this State are prohibited from becoming indebted in any manner to an amount exceeding in any year the income and revenue provided for such year" Logically and naturally a county court with this mandate of the Constitution before it will first provide or determine what amount of revenue and income will be

required, and how much it is authorized to raise; and obeying the statute, sections 7661, 7662 and 7663, will at its May term proceed to levy, appropriate, apportion and subdivide the revenues to be collected, and moneys to be received, for the purposes prescribed in section 7663, among other things, to meet the "current county expenditures," and the county treasurer is required by section 7665 to separate and subdivide such revenue on his books, and it is on this revenue, so provided, appropriated and separated, the warrants of the court are drawn, and section 7666 expressly provides that the county court shall order their clerk to issue warrants payable out of money appropriated for each specific purpose. In view of the Constitution, the purpose the convention had in view, and all the legislation on this subject, would it not be a clear violation of the spirit and letter of the statute to permit the county court to draw warrants on the revenue of any fiscal year before the court had provided, levied or appropriated that revenue? To do this would be a misapprehension of the purpose which both the Convention and the Legislature had in view. On the other hand, an observance of the statute will conform the fiscal year to practical working of the system.

When it is considered that the assessors enter upon their duties on the first day of June and are allowed until the twentieth of January of the next year in which to complete their assessment and make their returns to the county court, and that the board of equalization meets on the first Monday in April, and the fourth Monday in April is fixed for showing cause against an increase of valuation, it is apparent that the assessment, the very basis of taxation, is not complete until just prior to the May term of the county court.

Until that time the court under our system can not know what amount of property is subject to taxation, and under our system of grading the rate according to the assessed value of the county, it can not know whether it can levy a rate of fifty

cents on the hundred dollars, or forty cents, or thirty-five cents.

Evidently the amount of revenue the county court can provide depends upon the assessment and it was not intended it should draw warrants in ignorance of its own limitations in that regard. By abiding the assessment, and then estimating the needed revenue it can act intelligently, and after having provided the tax by its levy, and apportioned it to the several funds, it may then anticipate the collection of that revenue, but not before. They are not authorized to guess what the rate will be or what the expenditures may be. The settlement of the collector in March has no relation to the fiscal year further than it is clearly intended that he shall have gathered the taxes levied and made his final settlement so that when the county court, which must audit and determine the financial condition of the county at its May term, can know definitely whether the warrants have exceeded the revenue by reason of delinquencies, or the revenues have exceeded the warrants, and left a balance in the treasury which as a surplus fund may be applied to warrants of previous years in accordance with an act of the Legislature, approved March 31, 1893, as expounded by this court in Andrew County ex rel. v. Schell, 135 Mo. 31. It must be so because under this act and section 3166, until the final auditing at the May term, the only time when the county court is ordered to strike a balance, it can not be known what the ordinary expense of maintaining the county has been, and when that is ascertained at that term, then, if there be a surplus, it is entirely lawful to apply the balance to warrants theretofore lawfully issued, but not paid.

In a word, we think that as the Legislature fixed a definite time when all state revenues should be balanced by the State Auditor, and defined the fiscal year therefor, so in the sections hereinbefore quoted it has fixed the county fiscal year from May to May. As confirmatory of this view we find

that the legislature by an act, approved April 8, 1895, has so amended section 3212, Revised Statutes 1889, providing for county repositories as to require the county courts to select the depositories also at the May term, and that their terms should begin and end at that time.

Upon a reconsideration and upon more mature reflection we are of opinion that the construction which adjudged that the fiscal year in county affairs began January first, and ended December thirty-first, in Wilson v. Knox County, was wrong, in that it was predicated upon a statute which was intended to govern only the State treasury, and is not in harmony with the Constitution of Missouri and the statutes *in pari materia*, and should no longer be followed.

We have not reached this conclusion hurriedly nor willingly. We feel the full force of the principle of *stare decisis*, but we feel that if we now return to the purpose of the convention that framed the Constitution and the legislature which has enacted the various statutes regulating the collection of taxes and supporting the county organizations, we will best subserve the interests both of the counties and their creditors.

As the warrants for ten thousand dollars drawn between January 1st, 1895, and May 1st, 1895, were drawn prior to the fiscal year of 1895, they can not be paid out of the funds provided and appropriated for the ordinary expenses of that year to the exclusion of relator's warrant drawn after said fund was provided, apportioned and appropriated for the running expenses of said county for said year.